Hear ye, hear ye, hear ye. United States Court of Appeals for the 11th Circuit is now open according to law. God save the United States in this honorable court. Good morning, everyone, and welcome to today's session in the 11th Circuit Court of Appeals. Judge Branch and Judge Grant and I appreciate counsel's cooperation in holding this argument remotely by Zoom today. Counsel, you should be able to see on your screens our timer, which will display the time you have remaining in your argument. When you get down to two minutes in your time allotted, the timer will turn yellow and then it will turn red when your time has expired. Also, when you have two minutes left, Mr. Thomas will give you a verbal warning about that. Mr. Fougere, I see that you have reserved five minutes for your rebuttal, so your first session will count down the time you have in your original session. If we experience technical difficulties today, and we sometimes do, I ask that you be patient and bear with us. Our excellent IT team is with us and they should be able to resolve any problem and get us back to the argument as quickly as possible. Counsel, I remind you that we have read your briefs and the materials you submitted, significant parts of the record, so we urge you to jump right into the heart of your argument and use your time widely. I'll now call case number 19-12133P, James Edward Barber versus Commissioner Alabama Department of Corrections. Mr. Fougere, you may begin when you're ready. May it please the court, Josh Fougere on behalf of the appellant, Mr. Barber. Mr. Barber was sentenced to die after a trial in which counsel recognized that his guilt-faced offense was impossible and therefore knew that Mr. Barber's life depended on the case's penalty face. Despite those life or death stakes, the jury and judge never heard that Mr. Barber made multiple suicide attempts, including being found on his bed with a shotgun at his head and suffered from depression. The jury and judge never heard about Mr. Barber's extensive family history of mental health issues, that his mother, for example, was hospitalized multiple times for mental health problems and suffered episodes like being catatonic for a week, sitting in a chair without blinking or moving, and losing 60 pounds when Mr. Barber was in his early teens. The jury and judge never heard that his family's profound mental health and substance abuse issues left Mr. Barber adrift and that as a result, he started drinking at just eight years old. That's the third grade, and his home life was littered with drug and alcohol abuse by family and friends who were supposed to be his caretakers. That presents a materially different picture from the one the jury saw. Trial counsel painted a picture of someone who grew up in a bucolic New England town, riding mini bikes with a pleasant home life, good parents, and a, quote, happy childhood. Someone who, like many kids, hung around the partying type crowd with drugs and alcohol in high school in order to fit in, and someone who, as an adult, was, quote, pleasant and considerate, but whose, quote, personality did change when high on drugs and alcohol. That picture has no basis in reality. The picture from a constitutionally adequate mitigation investigation would have shown, among other things, Mr. Barber with a shotgun pointed at his head, his frail mother catatonic and staring blankly from a chair in the corner of the room, drugs and alcohol strewn all over the house, and an eight-year-old boy drinking. Those are two very different pictures. A hapless crackhead doing a bad thing is not the same as a suicidal individual who broke after a broken life. A 42-year-old with an idyllic childhood who went on a drug and alcohol binge and made a bad decision is not the same as a person who started spiraling downward at just eight years old and whose family gave him no ability to escape. Despite trial counsel's penalty phase failings, the state court upheld Mr. Barber's death sentence, but it did so in contravention of clearly established law on both of Strickland's two prongs. Applying a demonstrably wrong legal standard at each step and misapprehending the proper Strickland analysis. On deficiency, as the district court all but recognized, the state court's rigid standard, differentiating between no or some mitigation, misstated clearly established law as Sears holds. And, as the district court indicated but then sidestepped, when the deficiency question is analyzed correctly, the meager mitigation investigation that led to the misleading image of Mr. Barber described above was inadequate. It was the shortest of Dr. Rosenzweig's career in which she admittedly did not learn core facts about Mr. Barber's upbringing in life. That is true, moreover, even though Dr. Rosenzweig and trial counsel had numerous unexplored names and information on their desks and at their disposal that would have unlocked critical evidence on issues like mental health. Counsel? Yes. Mitigation evidence was presented. There was evidence that he had started drinking at a young age, that he had been running around with a crowd that was also into alcohol and drugs. He was, there was mitigation evidence presented. Dr. Rosenzweig did do an investigation. Yes. Admittedly, though, your client did refuse to participate. So, what role does that refusal to participate have in our analysis, especially when there was an investigation done despite your client's refusal to participate? So, a couple of answers to that. I think legally it does not investigate. There was a lack of cooperation in Porter and Rompia and it did not prevent the court from nevertheless finding that there was a Sixth Amendment problem. And the second part is that Dr. Rosenzweig's testimony about Mr. Barber precluding her from doing an investigation simply does not hold together. This is not a case where they did not put on a mitigation case. As you say, they did. They put it on. He did not block her from doing that. He spoke with her for two hours and she never came back. That was eight months before trial. He likewise said, he likewise gave them 11 names of people who were there on their desks available for mitigation investigation, including Beverly Reisdorf, Mr. Barber's sister, who would have testified about the suicide attempts and longstanding individual and familial mental health problems. But trial counsel and Dr. Rosenzweig simply did not reach out to those people. Eight of 11 names that he gave them, they did not reach out to. So, this is not a case where he said, do not put on a mitigation defense at all. He did not say that. He testified at the Rule 32 hearing that he did not say that. He gave them names and they did not follow through. So, even though they have a constitutional duty irrespective of how cooperative he was, the fact that the allegation that he was not cooperative simply does not hold together. And the testimony shows that from the Rule 32 hearing. The names were there. They had the individuals. They simply did not follow through. And the district court effectively recognized as much. The district court said, look, I am going to skip past deficiency, but I think the words were at least a close question, to talk to Mr. Barber for two hours only once, never come back, and to talk to four other folks for a total of four hours, to never follow up on any documentary records or anything like that. When the names were right in front of them, they were staring them in the face and they did not follow up. Do you have any examples of cases where evidence of suicide attempts were considered to be game-changing mitigation evidence? There are a number of cases where suicide attempts and mental health problems have come up. Maples is one of the cases that we cited in our brief where suicide attempts were an important piece of the puzzle. In Cooper, that was another piece of it. There was, of course, abuse there as well. But suicide attempts were a piece of the puzzle. The same in Andrus, the Supreme Court case from this year. And more generally, that is, again, as Porter and Wiggins say, these mental health problems, both from his family and from himself, are the kind of troubled history that the Supreme Court has said is relevant to assessing a defendant's moral culpability. The trial court, the jury and the judge heard none of it. There was nothing whatsoever about either his family, his mother's issues, his grandmother's issues, his sister's issues, or his own mental health problems presented. There are Maples cases unpublished. What is the closest published case you have that being enough to get us past the hurdle here? I think a number of cases, including Cooper, Sears from the Supreme Court, Johnson from this court, Porter from the Supreme Court, talk about, and Andrus from the Supreme Court, talk about suicide specifically and more generally about mental health problems. And mental health problems being distinct from substance abuse problems. The state wants to lump them together at page 45 of the state's brief. They say the evidence at trial was presented on mental health issues because there was evidence of substance abuse, but they're just not the same thing. Porter had some intoxication evidence at trial, but it was unreasonable to discount entirely post-trial mental health evidence, as the state court had done. Andrus is similar. And Johnson, there was a lot of substance abuse and some expert testimony on mental health issues. But the trial court and the jury didn't hear about, in that case, it was the mother, not the individual, but suicide issues that this court held changed the picture. It was a different picture from what was presented at trial to what should have been presented in light of an adequate mitigation investigation. How does the grandmother's mental health factor into this? Because I think Barbara's sister, who was seven years older, testified about the electroshock therapy of the grandmother, but said that that was something that even she was too young to remember. And if she's seven years older, how is the grandmother's mental health relevant? It's relevant in two respects. One is that it's relevant because these issues are hereditary. And that came out, of course, at the post-trial evidentiary hearing. These issues are hereditary, and it's clear that they fell down to Mr. Barber and affected his life. And it's also relevant because she was a family member around for his upbringing. And when people, including his mother and grandmother, people who are supposed to be role models, are instead suffering from severe mental health problems, catatonic at points, going through shock treatment, he's obviously not getting the kind of support from parents, grandparents, role models that he ought to have. And this is something that the jury heard nothing about. Well, the jury did, in fact, hear about the fact that he was one of, I think, seven children, and that a lot of attention wasn't paid to him, and he was sort of left to his own devices at a young age. So how is the information that you're looking to introduce not simply cumulative of the fact that they did have details of sort of the neglectful, as you're calling it, upbringing? Yeah. And I think I'd say a couple of things in response to that. The first is that there was absolutely the testimony from Dr. Rosenzweig that in a household of seven children, the parents can't always pay attention to everybody. But that context of a picture presented of Mr. Barber, where that was part of, again, an idyllic childhood where everybody's out riding bikes. But Dr. Rosenzweig testified at the Rule 32 hearing that she had no information to indicate that any of Mr. Barber's family members were poor role models. That's at 1564, page 62. So the negative impact of these role models like Joel Barber, his brother, and his brother-in-law, Ron Kitteridge, who had violent streaks, who were drug addicts, convicted criminals, detached parenting style that led to a lack of intervention or a lack of guidance, no active involvement in their kids' lives, is, we think, a part of a picture that is simply categorically different from one that says, these were good parents, it was a great childhood, it was a great life. Sure, they weren't able to pay close attention to everybody at all the same time. But at the end of the day, everybody was having fun, was happy, the parents didn't divorce. It's just not the same picture as one where they're paying no attention, people who are supposed to be taking care of him are being convicted of crimes, are high on drugs and alcohol, are violent. That's not the kind of role model or parental supervision that was painted to the children. If Barber himself testified that he had a wonderful childhood and the family had animals and horses and a pool, all these sorts of things, if that's his own testimony that he had a wonderful childhood, how do you get around that? Because, and Dr. Salekin testified about this in the post-trial hearing, oftentimes that's in some sense exactly why you need to dig deeper, particularly when you have these names like his sister on your desk, because defendants will often remember things in a way or try to paint their past in a way that for whatever reason is inaccurate. And Dr. Salekin testified to that explicitly. And so you have to dig deeper. And when you have, again, his sister's name right there on a list and you don't contact her, and so you don't learn that, in fact, it wasn't so happy. Maybe they had a pool, maybe they had mini bikes, but there were people high on drugs and alcohol. There was a catatonic mother, he tried to kill himself. That is different. And his testimony that he thought that in hindsight his childhood was happy doesn't change that. I wonder if you can help me understand generally how Mr. Barber's own testimony at the habeas hearing fits into this case, because it seems to me that you rely on that testimony to weave together with the two experts to show how his addiction might have affected his crime. But had Mr. Barber testified after having claimed innocence at the trial, if he had testified at the penalty phase, what would the jury do with that? So tell me how that fits into the prejudice analysis. Mr. Barber's testimony about substance abuse and his state of mind at the time of the crime specifically. So I think that that, I think it's part of the reweighing that has to where you take everything that came out both at trial, aggravating and mitigating, and you take what came out after trial and you put it all together. And here the sentencing order contained a number of findings that respectfully we think there's a reasonable probability that they would have been different or that they could have changed. So on statutory, this is at the very end of appendix three, the sentencing order, but on statutory factors two and six, the trial judge said intoxication, quote, may have bolstered his willingness to commit the offense, but he found no evidence that he was under the influence of extreme mental or emotional disturbance. And likewise, drugs and alcohol, quote, may have given him the tenacity to commit the crime, but again, found, quote, no evidence that his capacity to appreciate the criminality was substantially impaired. And if you put together all of the information that came out, including Mr. Barber's testimony, that he just snapped, he didn't really know what he was doing. From the rule 32 hearing, we think that there's a reasonable likelihood or reasonable probability that those findings could change. They were undermined, the sentencing findings, just like happened in this court's Williams case. What about particularly with our case, James v. Warden, where we said as a threshold matter, the defendant must show a reasonable probability that if he had been more fully advised about the mitigating evidence and its significance, he would have permitted trial counsel to present the evidence at sentencing? Yes, yes. And I did see that case and that Your Honor wrote it. But this is not a case where the state is arguing or where anybody has argued that there was a complete shutdown of the mitigation evidence and therefore that he needs to show that threshold reasonable probability that he would have permitted a mitigation case if he were more fully advised. That's not what's going on here. The state's never argued it and there's no evidence. And unlike in James, there is evidence not only based on the fact that he did put on mitigation evidence, but that he would have allowed more. At 1565, page 62, he's asked, did you do anything to frustrate your attorney's efforts to put on the mitigation case? He says, not to my knowledge, but may I elaborate? The only thing I insisted on is that they don't bother my mother. And he goes on and explains that she was 75 years old with the onset of COPD, a serious respiratory disease, and had lost a son and a husband in the last decade. He doesn't say, and in fact testifies the opposite, that he would not have allowed them to put on that case had he been more fully advised. What about the evidence that he perhaps I'm sure it's an overstatement to say that he was seeking the death penalty, but I think we've got tests that suggest that perhaps he thought he would get excellent appellate lawyers, such as yourself, if he had penalty, whereas maybe if he didn't, he wouldn't have such vigorous representation. What are we to make of that? That testimony comes in the context at two points. One is the context of that testimony is important. The point in time he's talking about. He's talking about a plea offer and he's saying that he wanted to have hope at that point. He didn't like the choice that he testified was presented to him, that it was either the death penalty or life without parole. He testified as well at the Rule 32 hearing that he didn't know other defenses could have led to a lower sentence. But in any event, the testimony that's clipped off from, I believe, the state court's decision goes on at 1565 pages 60 to 61 to say very clearly, I didn't want to die. I never told them, oh, you know, I don't want to live. I want to die. That's not what it was. I want to live. I always did. So it's not a case where he said, I want the death penalty. I'm not going to put on a mitigation case. He didn't say that. He was presented with a sort of stark choice between two plea options and at that point said, I don't want to do that. But it wasn't a case where he sort of shut down the mitigation testimony or said, give me the death penalty full stop. I thought that came in when the court started questioning Dr. Rosenzweig, where that was her understanding of why he was not cooperating with her. It was both. Mr. Barber testified about this at the Rule 32 hearing, but Dr. Rosenzweig did also say that she didn't put on the mitigation case she wanted to put on in effect because he wanted to get the death penalty. But again, that testimony simply doesn't hold together. She talked to him for two hours and she gathered a whole bunch of information from him. He didn't say, I'm not going to talk to you. He talked to her for two hours. She just never came back. That was eight months before trial. She and trial counsel had a list of 11 names. They didn't talk to eight of them, including people who would have unlocked key issues like mental health. So the notion that she didn't spend as much time on this investigation because he refused to cooperate with her, it just doesn't hold together. The names were there. They had the information. They had the leads. They simply didn't follow up. They abandoned the investigation at an unreasonable juncture. She did testify that there were people that she tried to reach repeatedly. She also testified that there, I think, was at least one person that she contacted who refused to talk to her. She did. So she is doing follow-up. That is what her testimony suggested. What was she supposed to do past that? At a minimum, follow up on the leads that were on her desk and in front of her and see where it takes her. See where talking to Beverly Reisdorf, who testified that no one contacted her and would have testified about all of these mental health problems, both for Mr. Barber and for her, about his upbringing, about poor role models. See what she says. But she didn't do that. She called a few people, got through to a couple of and then stopped. The names were there. She asked for records and didn't get them. That was the end of it. She didn't follow up as far as the record shows. Trial counsel didn't give them to her. So at a minimum, this is a situation where the information is in front of you. It is staring you in the face. You don't do it. She didn't go back to Mr. Barber and say, hey, I tried X or Y from your list and that person wouldn't pick up the phone. What do you want to do? She never went back. She talked to him for two hours, which was the lowest amount of her entire career, eight months before trial, didn't go back. It didn't even seem like she was aware that there was a period of time after there was an initial mistrial until the second trial when she could have continued to do her investigation. She just stopped. And trial counsel didn't do anything more His testimony was to the extent there was a strategy. They looked at the statutory factors and then they handed the ball over to Dr. Rosenzweig. And that was it. In terms of prejudice, we reweigh the factors on habeas. We have to weigh the mitigating factors against the aggravating. Am I correct that there was nothing in the Rule 32 hearing that specifically addressed the heinous, atrocious and cruel aggravating factor? Because that's based on the victim's experience, right? That's correct. The state, I don't believe, put on any testimony in the Rule 32 hearing. So the aggravating factors are what they are based on what was found in the first instance. And I think it's important to remember in doing this exercise that those factors existed. And nevertheless, Mr. Barber still had one vote for life. With everything else in the mix in the reweighing, there is, as in Jefferson, a plausible explanation that exists for the first time about some of this stuff. And this Court, of course, knows that this Court and the Supreme Court that an atrocity aggravator is often found in cases where nevertheless the Court in reweighing the evidence says there's a reasonable probability that at least two jurors would have changed their vote. We've asked you this a little bit, but what's the closest case you've got to mitigating evidence of this sort overriding in prejudice the heinous crime of the sort that was committed here? Sure, there are a number of cases that I had mentioned earlier where both Cooper and Johnson were ones in which there was an aggravating factor of cold calculated, premeditated, similarly heinous, atrocious, and cruel. And Jefferson, Farrell, Hardwick, these were all cases that had... What's your closest? What would you tell me is your best case on that front? You know, I think I love Maples, but I recognize that it's unpublished. So in terms of published cases, I'd probably say Cooper is one of the closest ones. There was actually quite a lot of mitigation evidence put on in the first instance, but the picture changed when more came in that changed the picture, including about depression and suicide. That was a case where there was an atrocity aggravator and nevertheless the reweighing changed it. And we think respectfully that's the case here. You've got a sentencing order where there are a number of findings that there's at least a reasonable probability in reweighing everything, the mitigating findings that would have been different. The state put on no evidence in the Rule 32 hearing. And when you put two pictures next to each other, one of an idyllic childhood and one of a person who broke at the end of a broken life, we think that, again, having already had one vote for life, there's a reasonable probability that at least two more jurors would have changed their vote. I see I'm close to the end, so... I'm happy to stop there and wait for rebuttal unless the court has any further questions in the last 25 or so seconds. Thank you, counsel. Mr. Johnson, you may proceed. May it please the court. In adjudicating Barber's penalty phase and effective assistance of counsel claim, the district court did not render an opinion regarding the deficient performance prong, Strickland. Instead, the district court correctly held that the state court's conclusion that Barber failed to satisfy his burden of proving prejudice was reasonable. This court can conduct the same analysis. This court can and should review whether the state court's determination that Barber failed to prove prejudice was reasonable, hold that the district court correctly found that it was, and affirm the district court's judgment. If this court reaches, however, the deficient performance prong, it should find that Barber is mistaken in arguing that in the alternative, Barber's claim that his counsel were deficient fails under DeNovo review. And just turning to DeNovo review, because that may make it simpler for this court, this court looks at two things in the context of a penalty phase IAC claim. Whether counsel reasonably investigated possible mitigating factors and whether they made a reasonable effort to present mitigating evidence. Turning first to their reasonable mitigation investigation, it was reasonable. Although they conducted a reasonable mitigation investigation, trial counsel Robert Tootin and Ben Boyenton, their mitigation expert, Dr. Rosenzweig, and their investigator, Donald McVeigh, they were all hindered in their efforts to gather mitigation by Mr. Barber's refusal to cooperate and active obstruction of their investigation. Indeed, Barber's strategy from the beginning was to receive the death penalty if he was convicted. He testified to as much at the Rule 32 hearing, and it's important to understand exactly what he said about that. He said that he believed that life without parole was no hope. And then he elaborated, if things did go wrong, and I, you know, was convicted and I got the death penalty, there would be people there to help me appeal my case, and then I would have some hope. So, we certainly agree, he did not want to die. That was never the point of this. The point of this was that he made a strategic decision himself that he wanted the death penalty so he could get better attorneys, such as Mr. Fugary, to handle his appeals. And so, counsel and their just to give some examples. Well, Mr. Johnson, regardless of whether they were, sorry, let me try to get rid of that echo. There we go. Sorry about that. Mr. Barber clearly provided the names of people to his counsel and to Ms. Rosenzweig that were not followed up on. Isn't that right? There were a few that were not followed up on. And the defense team failed to get his school records, his medical records, other criminal history records, employment records, records about the family. Isn't that right? Yes, but Rule 32 counsel also failed. There was more that the defense team could have done. There were clearly avenues they did not explore. And the question, according to case law, is whether their investigation was reasonable. That's the standard, right? Yeah, that's correct. So tell me why it was reasonable not to contact these additional witnesses that he did provide or to obtain any of these records. Well, for two reasons, Your Honor. One, he gave them certain names and they followed up on as many as they could. And as Dr. Rosenzweig explained, let's take, for example, he provided them with the name of his ex-wife and I believe his ex-fiancée. She tried to track these people down. Remember, this was in the early 2000s. We're talking 2002, 2003. And she, for example, Teresa Stark, I believe was the name of his ex-wife. She asked his brothers, Mark and Glenn Barber, for information for Teresa Stark. They didn't have any information for her. So they said, talk to our mother, Elizabeth Barber. She talked to Elizabeth Barber and neither did she. So she tried to run down these leads, just like she tried to run down the lead with his other brother, Darren Barber. She had four different phone numbers for him and she called and she called and she called and she never could get a hold of him. And she testified she wasn't even sure she had the correct information. So she was working with his family members. She tried to locate people. She did the best she could at the time. And as for the records, with her testimony, there are a couple of people she could not, she tried and she could not run down. But she never testified that she couldn't get in touch with anybody else. There was no one else she could have talked to because of Mr. Barber's lack of cooperation. Am I right about that? Well, she certainly testified that she also tried to talk to people who wouldn't talk to her. Liz Epps, he really wanted her to talk to Liz Epps, the victim's daughter, who he had dated before he murdered her mother. But Liz Epps wouldn't talk to her. There was another gentleman who wouldn't speak to her, as explained in the state's brief. So she either couldn't locate people whose names she was given or some of these people wouldn't speak to her, as laid out in our brief. The answer to my question is no, she never testified that she was at an absolute dead end, that there were no people she could follow up with. And she also never testified that Mr. Barber in any way prevented her from obtaining these records, right? Mr. Barber? No, Your Honor. He didn't do anything to impede her on getting those records. But what's important to understand regarding these records is that the only records that were introduced in Rule 32, and this is Document 16, Volume 23, these were the ones that were introduced at the Rule 32 hearing. Number one, Barber's records from a Connecticut hospital in 2000, dealing with his kidney stone problems. Number two, list of five Connecticut offenses that he committed, three of which were no frost. Number three, a CVS pharmacy prescription for penicillin. It's kind of curious as why that's in the record. A handful of school records, but the purpose is unclear because Dr. Rosenzweig testified at length at trial about his school performance. Five, Barber's records from a Huntsville hospital in 1999 pertaining to treatment for bursitis in his right knee. Number six, his mother's hospital records from 2007, which number one, wouldn't have been available at his trial in 2003. And number two, were about COPD. And then finally, arrest records for Joel Barber and Ronald Kittredge. My friend on the other side talks a lot about the suicide attempts and the mental health problems. There are absolutely no mental health records in the state court record for anybody, not for Barber, not for his grandmother, not for his mother, not for his sisters, nobody. And there's also nothing in the records that I just mentioned to you. And those are the only records that were introduced in rule 32 that would have presented a red flag. The content of that goes to prejudice, right? Sorry. I'm sorry. Prejudice, correct? In other words, what we're actually in, have they been found? That's a prejudice issue. Yes, to an extent, but it also goes through deficient performance because we're talking about what would have alerted counsel to red flags. Did they miss red flags? Was their performance deficient? And the answer is no, because they contacted everybody they could contact, as did Dr. Rosenzweig, as did Donald McVeigh. When someone commits a crime of this nature, though, and someone who didn't have the extensive criminal record that you might expect, didn't counsel have some obligation to do a serious might mitigate the aggravation evidence? Well, I mean, they hired Dr. Rosenzweig, and it's important to remember Robert Tootin was Mr. Barber's lead counsel, and he had tried 12 to 13 capital murder cases before this, and he had worked with Dr. Rosenzweig before. And he testified at the rule 32 hearing, he chose to hire Dr. Rosenzweig, who was a clinical and forensic psychologist, because he thought she was the best mitigation expert in the state of Alabama, and they'd worked together before. And she did do an evaluation, at least for competency, mental status evaluation, and to generally assess background psychological issues. She didn't see any red flags, and she didn't recommend any further investigation into mental health. And I guess this goes more- What about the hiring of Dr. Rosenzweig? We do have testimony that this is the shortest period of time that she's ever spent in her career, meeting with the defendant, less than two hours. Your opposing counsel has made much of the short period of time that she spent on this case. She didn't go back to Mr. Barber. Can you speak to the really, what appears to be somewhat truncated nature of her investigation? Certainly, Judge Branch. What we have in the record is her was that Mr. Barber absolutely would not cooperate in giving her contact information. And she was particularly interested in getting the names of his collateral witnesses, and particularly his friends in Alabama, and friends in Connecticut, and also ex-wife and ex-girlfriend. And he was adamant that he would not provide them to her. That's her sworn testimony at the Rule 32 hearing. And also, it's interesting in the Rule 32 hearing, this was elicited during direct and cross-examination. But towards the end of her examination, the Rule 32 circuit court, the trial judge, took over and began questioning her to confirm that that was the case. And Dr. Rosenzweig did have an interesting exchange with the judge in which she said, Your Honor, that is why I didn't go back. That's why I couldn't do anything more. I had these names. I didn't have contact information. He would not cooperate with me. And that's borne out by what everybody else testified to. Donald McVeigh, the investigator, also met with him. And he testified at the Rule 32 hearing that Barber treated him the same way. You, we also need to factor in, they were both working on this. In addition to counsel, there were four members of this defense team. So Donald McVeigh, Robert Tootin, and Dr. Rosenzweig, Ben Boynton, had died by this time. But those three testified at the Rule 32 hearing, and their testimony was all the same, that they got these few names out of Mr. Barber, but not contact information. In cases like Williams and Wiggins, the Supreme Court has referred to the American Bar Association guidelines on death penalty representation. And at the time of Mr. Barber's trial, the ABA guidelines provided that, quote, the investigation regarding penalty should be conducted regardless of any statement by the client that evidence bearing upon penalty is not to be collected or presented. Those were the guidelines that were in effect at the time of Mr. trial. How does that affect your argument about Mr. Barber's lack of cooperation? Well, number one, Your Honor, the ABA guidelines, certainly as the, as the Supreme Court, as this honorable court has recognized, are just that, just guidelines. They're not binding on anybody. But that's not the state's argument. The state's argument is not that counsel just gave up. It's that in spite of the fact that Mr. Barber obstructed them, they did persevere, they did present, they did conduct a reasonable mitigation investigation, and they did present a reasonable mitigation case. And just to be specific on a few of the things they did, I mean, let's look at what Dr. Rosenzweig did. I mean, she spoke extensively with Mark, Elizabeth, and Glenn Barber, two brothers and his mother. She spoke with Keith Collins, a friend who was referred to her, not by James Barber, but by his brother, Mark Barber. And she also spoke with Sergeant Dunn at the Madison County Jail. She tried to speak with another person, Chris Beckham, who she got from Keith Collins, who would be a current friend of Mr. Barber here in Alabama. He would not speak to her, as I've already mentioned, Liz Epps, the victim's daughter, would not speak to her. She tried hard to contact Darren Barber, Teresa Stark, and those folks would not, would either not speak to her, or she couldn't get information to find them. And something else needs to be clarified. Counsel for Mr. Barber has spoken about his sisters. They were contacted. In particular, Margaret Kittredge and Beverly Breisdorf and his brother, Glenn Barber, somebody obtained letters from them and presented them at the penalty phase. And every reason to believe is that that was Ben Boynton for two reasons. Mr. Tootin and Dr. Rosenzweig were asked repeatedly and did not recall ever speaking with or communicating with his sisters at the Rule 32 hearing. So it's only logical because we have those in existence, they were introduced and they're in the clerk's record from the trial. So we know that this happened. It's only logical then that Mr. Boynton did that. It's also logical that he did that because Mr. Boynton was in charge of handling the direct examination of the lay witnesses at the penalty phase. So he did the direct examination of Mark Barber, Elizabeth Barber, and Alex Dreyer, whereas Mr. Tootin, lead counsel, focused all of his efforts on Dr. Rosenzweig. So that's further evidence that Mr. Boynton, who we must presume acted reasonably, was the one who contacted Mr. Barber's sisters and brother Glenn and obtained those letters and presented those letters at his trial. And also Alex Dreyer. There's no evidence that he was the fourth person to testify at the penalty phase. He was Mr. Barber's jail minister. He testified extensively about Mr. Barber's behavior in jail, his Christian faith, how he'd never had a single disciplinarian two and a half years, and how he was an inspiration and begged the jury not to recommend a death sentence. Well, who contacted him? It wasn't Mr. Tootin or Dr. Rosenzweig. They said they didn't. So again, that's gotta be Mr. Boynton who did that. But the overall point is that you had four members of this defense team, two attorneys, Dr. Rosenzweig and Mr. McVeigh, all working hard. And despite the obstruction, they gathered a reasonable mitigation case and presented it. And just turning very quickly to the mitigation presentation that was presented and why it was reasonable, Mr. Barber continues to claim that his counsel presented a slim mitigation evidence and their entire mitigation case related to his history of drug and alcohol abuse. That is not so. They humanized him through the testimony of Mark and Elizabeth about their love for him, his big heart, his willingness to do anything for anybody, everything he did to help his mother and his father, especially after his father became ill with cancer. They showed the devastating effect his execution would have on his family through Elizabeth's testimony that she had already lost one son who was murdered and that she could not bear losing another son. They further humanized him, as I just mentioned, through the testimony of Alex Dreyer, the prison minister. And building on Mr. Dreyer's testimony, Dr. Rosenzweig used that to testify that he had been a model prisoner. Also, presumably she obtained this information from Sergeant Dunn, who had no disciplinaries in two and a half years, and that he wouldn't be a risk if he was sentenced to life without parole. That's compelling mitigation evidence. Dr. Rosenzweig also testified about his remorse that she believed it was genuine. Dr. Rosenzweig testified that, in her view, Mr. Barber did not know right from wrong and did not have the intent to kill Dorothy Epps. Dr. Rosenzweig testified as to many positive traits he had, including his work ethic. And Mark Barber laid the background as to his substance abuse. And then Dr. Rosenzweig, who testified at length of the penalty phase of the trial, followed up by that by explaining, and by using a chart even, to explain how his substance abuse affected his brain and his behavior. And she also explained that he was predisposed to substance abuse and identified members of the family. They weren't lying around drunk everywhere, but there were people in his family who did have substance abuse issues as well. So, in short, they presented a host of mitigating factors, including his lack of a significant history of a prior criminal activity, which was a statutory mitigating circumstance. So, in short, because they made a reasonable effort to obtain and present mitigating evidence, this court should hold that their performance was not deficient under de novo review. Has there been any discussion of whether, I didn't spot it, but I'm perhaps overlooked it, of whether kind of saying a lot of negative things about his family might have impeded the ability to make the case that his mother couldn't stand to lose another son? Is that something that's ever been discussed as a strategic decision of sorts? I don't believe that was addressed, Judge Grant, at the Rule 32 hearing. I could be mistaken, but yeah. I didn't think so, but wanted to see. Okay. Moving then briefly to prejudice. Again, the district court, we would argue, correctly applied AEDPA here, and we would urge this court to apply AEDPA as well and find that the state court's judgment was reasonable. But this court also, if it's simpler, can apply de novo review and simply find that Mr. Barber has failed to satisfy his burden of proving prejudice. As we explained in our brief, Mr. Barber relies almost entirely on Porter and Williams, but his case is... Go on to that, Mr. Johnson. I'd like to ask you about the Alabama court's prejudice determination. You say it withstands AEDPA deference, even though it didn't mention the words reasonable probability, it nevertheless follows Strickland because it cited Strickland. First, let me ask you, is there any indication in that opinion whatsoever that the court applied a reasonable probability standard other than the fact that it cited the Strickland case? Your Honor, I would have to answer it this way. It is a short, unpublished memorandum of opinion, and I would agree that it's not the clearest opinion ever written. The court did cite prior decisions in referencing the prejudice inquiry, and the court did, and let me get the language correct, it did state in setting forth the Strickland inquiry, the CCA stated that if it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, that court should be followed. That, in the state's view, indicates the state court was getting at, you know, what it meant was reasonable probability of a different outcome. But, you know, we would argue that it just, the fact that it did not use that phrase reasonable probability, you know, it's consistent with numerous other cases where the court just used a permissible shorthand recitation of the standard, and we would argue that's all the more the case because, you know, federal habeas courts must presume that state courts know and follow the there's no reason to believe from even reading what the Court of Criminal Appeals did here that it didn't know and understand the law. I mean, it clearly did. Is there no reason to believe that? That may be, I think, somewhat of an overstatement since it didn't or fully describe the standard. Wouldn't you agree with that, perhaps? Yes, Judge Grant, that might be a bit of an overstatement. But, you know, if this court doesn't want to grapple with that issue, then the easy way out is to apply de novo review, and that's what we would argue, and that way this court doesn't need to wrestle with whether ADPA applies or not because you know, just applied de novo review. In any event, despite his reliance on Porter and Williams, as we explained in our brief, this case is controlled by Penn Holster and Holsey, and that's because just like in those cases, the new evidence at issue here is cumulative in large part and insubstantial in other part. Largely tells the same story, more detailed version of the same story, more better details. That's it. Let's look at, there's several categories, and we've covered them all in our brief, but parental neglect. Mr. Barber makes much of the fact that his counsel were ineffective for failing to produce evidence that his parents supposedly neglected him and didn't discipline him enough. It's almost a reverse of what this all the time of my parents beat me and physically punished me. Here it seems to be, spare the rod, spoil the child, but in any event, Dr. Rosenzweig testified that Barber did not receive as much individual attention from his parents because he was one of seven children. She testified that he began abusing alcohol and marijuana at a young age, that his substance abuse escalated during his teen years, that he dropped out of school against his parents' advice, and that he sold marijuana out of his father's gas station. So it would have been easy for the jury to infer that his parents were not particularly attentive to him while he was growing up. Moreover, the argument that he was prejudiced by his counsel's failure to present evidence of his parents' so-called neglect is entirely weakened by his testimony at the Rule 32 hearing and Dr. Salekin's testimony at the Rule 32 hearing. James Barber testified on his own behalf of the Rule 32 hearing that his family, quote, had animals and horses, swimming pool, I had a nice life, my father bought us minibikes, my childhood was very good, I enjoyed it. Dr. Salekin testified that Barber benefited greatly by having an intact family. The Barber was not abused in any way or ever disciplined harshly, that he and his siblings always had food and shelter and clothing. So this evidence of parental neglect, even if mitigating, and we'll see what it was, would have been insubstantial and would not have been of such quality and weight to alter the balance between the aggravating and mitigating circumstances. But the pieces that I see that we're missing are the mental health pieces. And an opposing counsel has said that what the state is relying on is the substance abuse and that that is sort of the basis for arguing that any information that had come in about the mental health issues would have been cumulative. And while they're certainly related, they are separate as well. So we have one or more suicide attempts and we have some family history of mental health. And back to Judge Grant's question, do you have a case that suggests that either that this in and of itself is determinative one way or the other or is not? I would respond that the question is more of a factual one in light of the record. As I've already mentioned, there are no records supporting any problems or mental health problems on the part of Barber or anybody in his family. All we have, let's talk about these suicide attempts. We've got Mr. Barber's testimony that he committed suicide a couple of times, which was entirely self-serving in the Rule 32 hearing. And we have the testimony of one of his sisters who said that at some point her mother told her, and this had happened years earlier, that she came home and saw Mr. Barber putting a gun in his face. The sister testified that she didn't know if he received mental health or anything after that. So it's self-serving testimony on the part of Mr. Barber and completely hearsay on the part of his sister. And that's it. There's nothing to substantiate anything beyond that. And as for the grandmother, as this was mentioned earlier, his sister, who was seven years older, testified that she didn't even know what was going on with him. She was too young to and assuming he was, he certainly wouldn't have been old enough to understand what was going on. There are a couple of alleged instances about his mother. There's no allegation until I heard today about her just being in a chronic catatonic state. That's not in the record or the brief. And then his sisters, there's an allegation that one of them had depression and was hospitalized twice in the 1990s. Well, Mr. Barber would have been in his 30s at that point. It's hard to believe that a 30-something-year-old man would be deeply impacted and that would be mitigation evidence to have his sister treated for depression when he was in his 30s. So I would argue, Judge Branch, that it's more of a factual question. And I would urge this court to review the record and see much of the allegations about the mental health issues that are raised in the brief are not supported by anything in the state court record. I see I have two minutes left, so I'll just quickly wrap up. We would conclude by saying that Barber's crime was highly aggravated. Two aggravating circumstances, the most compelling of which was heinous, atrocious, cruel. The trial court made detailed findings in support of that aggravating circumstance. You know, in light of the fact that he brutally murdered an elderly lady by beating her to death with his hands and a claw hammer, there's just no reasonable probability that the new evidence produced in Rule 32, when combined with the old evidence, would have altered the jury's 11-to-1 death recommendation or the trial court's finding that the aggravating circumstances clearly outweighed the mitigating. So we would ask that this court please affirm the district court's denial of the habeas petition. And if there are no other questions, um, thank you. Thank you, Mr. Johnson. Mr. Fougere, rebuttal. Thank you, Your Honor. I'd like to make a few points about each of the pieces, and I'll start with deficiency. Mr. Johnson said that Dr. Rosenzweig testified that this was the best she could do at the time. That's false. As you said, Judge Pryor, and as Judge Branch indicated by calling the investigation truncated, she testified at the Rule 32 that it was not the best she could do at the time, that she wished she'd done more. The second point on deficiency is that Mr. Johnson said the sisters were contacted, including the one who testified at the Rule 32 at length about mental health issues, because somebody got their hands on a letter from her. Beverly Reisdor's testimony, this is at page 363 to 64 of the Rule 32 hearing, was, do you remember his trial attorneys? I don't remember them. No. Did any of his trial attorneys ever contact you? No. Did an investigator, a Mr. McVeigh, ever contact you? No. Did Jimmy's, uh, in the time leading up to Jimmy's trial, did you ever hear from a Dr. Marianne Rosenzweig? No. That seems pretty categorical to me. On prejudice, I'd say a couple of things. One, Mr. Johnson had no good answer to the question about whether the state court's decision applied the wrong standard and was contrary to clearly established law. This question should be, should be analyzed de novo. Mr. Johnson emphasized that trial counsel brought out humanizing evidence and about his jail time. That's true. And Mr. Barber got one vote for life. In Rompilla, there were five witnesses beseeching the jury not to convict him, including his young son, that they did it anyway. Here, he got one vote for life and, and the humanizing evidence doesn't change that. The question now is whether with a more complete understanding of how he got here, would two more people have changed their testimony? And I'd like to say quickly a couple of things on the parental neglect and mental health issues that Mr. Johnson hit on. First, as to parental neglect, um, both Dr. Rosenzweig and Dr. Salekin's testimony was contrary to what it was portrayed as. Dr. Rosenzweig said at the Rule 32 hearing that she did not follow up with Mr. Barber about parental neglect. That's 1564 at page 57. So it's not like she did all she could. And Dr. Salekin did testify that there was some indication of, uh, an intact home life, but she said explicitly at 1566, page 21, that the protective factors were not protective here because of the dysfunction in his family. Mental health, I'd just say a couple of things quickly. Mr. Johnson pointed out that there were no records. Um, that's true, but there was also no finding of credit that the testimony given at the Rule 32 hearing, both from Dr. Salekin and from Mr. Barber's sister, was not credible. There's no finding whatsoever about that. Testimony is evidence. The evidence is clear. The jury and the judge didn't hear it the first time around. And finally, briefly, uh, your honors had asked a couple of times about cases, and I just want to add two more in the mix. One is Hardwick, which was a case, um, where evidence about suicide attempts and alcohol and drug use the court held would have changed the balance in this, in the aggravating and mitigating factors, um, by giving the jury and the judge a more complete understanding of the defendant. And the DeBruce case, which says that a complete omission of, of evidence of the sort of mental health and, and also abuse is almost always prejudicial. It doesn't, it doesn't put it in quite those terms, but it says, look, when there's a complete omission of testimony about mental health and abuse, and here there was a complete omission of mental health testimony, that's usually a problem. And, and I would just close by saying that notwithstanding the, the questions about cases, this is, of course, a case-by-case determination in which the court is obligated to reweigh everything together. And we respectfully submit that in doing so, Mr. Barber has shown a reasonable probability that two more jurors would have voted to spare his life. Unless there are further questions, I would urge the court to reverse District Court's denial of habeas relief. Thank you, counsel, for your enlightening argument. Court will be adjourned for today. Thank you. Thank you. Thank you.